STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-1116


KENNETH DALE KELLY, ET UX.

VERSUS

BOISE BUILDING SOLUTIONS, ET AL.



**********

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 19528
HONORABLE WARREN D. WILLETT, DISTRICT JUDGE

**********

PHYLLIS M. KEATY
JUDGE

**********

Court composed of J. David Painter, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.


AFFIRMED.



Jerold Edward Knoll, Jr.
Attorney at Law
Post Office Box 426
Marksville, Louisiana  71351
(318) 253-6200
Counsel for Plaintiffs/Appellees:
     Kenneth Dale Kelly
     Jackie Denise Kelly

**Amos H. Davis**
**Attorney at Law**
**7932 Wrenwood Boulevard, Suite B**
**Baton Rouge, Louisiana  70809**
**(225) 248-1400**
**Counsel for Plaintiffs/Appellees:**
**Jackie Denise Kelly**
**Kenneth Dale Kelly**

**W. Michael Adams**
**Scott R. Wolf**
**Blanchard, Walker, O'Quinn & Roberts**
**Post Office Drawer 1126**
**Shreveport, Louisiana  71163-1126**
**(318) 221-6858**
**Counsel for Defendants/Appellants:**
**Boise Cascade, L.L.C.**
**Old Republic Insurance Company**

**Keith M. Pyburn**
**Larry Sorohan**
**Fisher & Phillips LLP**
**201 St. Charles Avenue, Suite 3710**
**New Orleans, Louisiana  70170**
**(504) 522-3303**
**Counsel for Defendants/Appellants:**
**Boise Cascade, L.L.C.**
**Old Republic Insurance Company**

**John A. Brittain**
**Attorney at Law**
**Post Office Box 2153**
**Natchitoches, Louisiana  71457**
**(318) 354-9935**
**Counsel for Defendant/Appellant:**
**Dwayne Myers**

**KEATY, Judge.**

This appeal stems from an incident between co-workers at their place of employment in which one of the workers was severely injured. For the following reasons, we hold that the trial court did not err in granting a motion for directed verdict in favor of the injured employee based on its finding that his co-worker committed an intentional tort upon him while in the course and scope of their employment. We further find that the trial court did not err in refusing to grant the defendants' request that they be given an offset against the amount they owe pursuant to the judgment for any future workers' compensation payments that they may pay to the injured employee. Thus, we affirm.

## FACTS AND PROCEDURAL HISTORY

Kenneth Dale Kelly was a forklift operator employed by Boise Cascade, L.L.C. (Boise) at its engineered wood products facility in Lena, Louisiana. On August 28, 2007, Kelly was sitting at a desk in the Boise shipping office with his feet propped up on a drawer when his co-worker, Dwayne Myers, moved toward him and, despite his protestations, put his hands on Kelly. Thereafter, the chair toppled over and Kelly fell to the floor injuring his back, which had previously been operated on in 2000 and 2002. As a result of his injuries, Kelly[1] filed suit against Myers and Boise.[2]

The matter proceeded to a five-day jury trial on December 13, 2010. After plaintiffs rested their case, the defendants moved for a directed verdict, contending that plaintiffs failed to prove by a preponderance of the evidence that Myers' actions amounted to an intentional act or that Myers' actions occurred during the

---

[1] The suit included a claim by Kelly's wife, Jackie, for loss of consortium.

[2] Old Republic Insurance Company (Old Republic), Boise's liability insurer, was named as an additional defendant by way of a supplementing and amending petition. Therefore, when we refer to Boise in this opinion, we are sometimes referring to Old Republic as well.

course and scope of his employment with Boise. The trial court denied the defendants' motion on the basis that reasonable minds could differ regarding whether Myers acted intentionally and whether Boise should be held vicariously liable for Myers' actions. The defendants then presented their defense to Kelly's claims, after which they rested their case and re-urged their motion for directed verdict. The trial court denied the defendants motion for the same reasons that it had rejected their original motion.

Thereafter, plaintiffs moved for a directed verdict arguing that reasonable minds could not reach any conclusion other than that plaintiffs had proven that: 1) Myers committed the intentional tort of battery upon Kelly; 2) the battery occurred within the course and scope of Myers' employment with Boise; 3) Kelly was not guilty of comparative fault for having caused or contributed to the accident, and 4) Kelly was injured as a result of Myer's conduct. The trial court granted plaintiffs' motion as regarding the first two issues and the remaining issues were submitted to the jury.

The jury determined that Kelly was injured in the August 28, 2007 accident and that Kelly was at fault in causing his own injuries. Fault was apportioned 30% to Kelly and 70% to Myers. The jury assessed Kelly's total damages at $944,940.00 and his wife's loss of consortium damages at $50,000.00. In a written judgment dated March 1, 2011, judgment was rendered in favor of plaintiffs and against Myers, Boise, and Old Republic, in solido, for the amounts awarded by the jury, plus interest and costs.[3]

Plaintiffs filed a motion for judgment notwithstanding the verdict (JNOV) seeking an increase in their awards for general and special damages, especially in

---

[3] The judgment contained a notation explaining that, pursuant to La.Civ.Code art. 2315(C), Kelly's award of damages was not reduced by the percentage of fault assessed to him by the jury. An amended judgment was signed on March 9, 2011, to correct the statutory reference to that of La.Civ.Code art. 2323(C).

2

those categories where no damages were awarded, such as for past medical expenses, past lost wages, past and future mental anguish, loss of enjoyment of life, and physical disability. The defendants opposed the motion, contending that the jury's verdict should stand given the conflicting evidence adduced at trial and the great discretion afforded to a jury when assessing damages. Alternatively, the defendants submitted that if the trial court were to grant plaintiffs' motion and award plaintiffs any amounts for past medical expenses or past lost wages, then the defendants would be entitled to a credit based on the amounts that Boise had previously paid to or on behalf of Kelly for medical and indemnity benefits. After a hearing, the trial court granted the motion in part, amending the jury's award of zero for past medical expenses and past lost wages to $62,017.30 and $129,667.07 respectively, and granting Boise a credit against those awards for the workers' compensation medical and indemnity benefits it paid to Kelly through the date of the verdict; plaintiffs' JNOV was denied in all other respects. The effect was to award Kelly an additional $48,748.50 in past lost wages, raising the judgment in plaintiffs' favor to $993,688.50.

Boise, Old Republic, and Myers now appeal,[4] asserting that: 1) the trial court erred in directing a verdict that an alleged intentional battery committed by Myers could be deemed in the course and scope of his employment with Boise for purposes of respondeat superior; 2) the trial court erred by making the first *LeBrane*[5] factor dispositive of whether Boise could be liable for Myers' battery upon Kelly; 3) the trial court erred in directing a verdict that a battery occurred; 4) the trial court erred in directing a verdict that Myers' actions were intentional acts

---

[4] Although Myers appealed and filed an appellate brief separately from Boise and Old Republic, his assignments of error mirrored theirs.

[5] See *LeBrane v. Lewis*, 292 So.2d 216 (La.1974) (employer of supervisor, who fired employee, followed him outside, and knifed him during a fight, held liable in tort to discharged employee).

3

for purposes of evaluating workers' compensation exclusivity; 5) the trial court erred in failing to direct a verdict in Boise's favor; and 6) the trial court erred in failing to grant Boise an offset for future workers' compensation benefits against the tort judgment awarding Kelly damages for future medical expenses and future lost wages.

## DISCUSSION

### Plaintiffs' Answer to Appeal

Boise's motion for suspensive appeal was filed and granted on May 19, 2011. Boise filed its appeal bond on May 26, 2011. Plaintiffs filed an answer to appeal in the trial court on June 2, 2011. The record was lodged in this court on September 12, 2011. Boise filed its appellant brief in this court on October 14, 2011. Plaintiffs filed a pleading entitled in part, "Original Brief of Appellees Kenneth Dale Kelly and Jackie Denise Kelly in Answer to Appeal Filed by Boise" in this court on November 14, 2011. In response, Boise filed a motion to strike plaintiffs' answer to appeal. Thereafter, plaintiffs filed a memorandum in opposition to Boise's motion to strike, along with a motion to supplement the record with the answer to appeal that they had previously filed in the trial court. Boise opposed plaintiffs' motion to supplement. We referred both motions to the merits.

In its motion to strike, Boise relies on this court's holding in *Smoot v. Hernandez*, 08-1121 (La.App. 3 Cir. 3/4/09), 6 So.3d 352, a matter containing facts remarkably similar to those presented in this matter. In *Smoot*, we wrote:

> The record reflects that the trial court granted Mr. Hernandez's appeal on July 16, 2008, and the suspensive appeal bond was filed contemporaneously therewith. At that time, in accordance with La.Code Civ.P. art. 2088, the trial court became divested of jurisdiction over all matters on appeal. An Answer to Appeal was subsequently filed by Ms. Smoot in the trial court, i.e., the Twelfth Judicial District Court, on September 16, 2008. Although this filing

4

was within fifteen days of the lodging of the record, the trial court no longer had jurisdiction. Thus, the Answer to Appeal filed on behalf of Ms. Smoot in the Twelfth Judicial District Court, although timely, was improvidently filed in the wrong tribunal. Therefore, the Answer to Appeal filed by Ms. Smoot in the trial court is not properly before this court.

Additionally, the Answer to Appeal and Opposition to Original Brief which was filed with this court on October 23, 2008 is deficient for two other reasons. First, as previously stated by this court, "[a] brief submitted by the appellee does not satisfy the requirement of [La.Code Civ.P. art. 2133.] (citation omitted)." *Broussard v. Leger,* 624 So.2d 1304, 1307 (La.App. 3 Cir.1993), *writ denied,* 93-2762 (La.1/7/94), 631 So.2d 452 (quoting *Sears, Roebuck & Co. v. Appel,* 598 So.2d 582, 584 (La.App. 4 Cir.1992)). Although Ms. Smoot's Answer to Appeal and Opposition to Original Brief states that Ms. Smoot was entitled to a modification of the general damage award, it was erroneously set forth in the brief and not a pleading. As such, it is insufficient to satisfy the requirements of an answer to appeal. Secondly, the Answer to Appeal and Opposition to Original Brief is deficient for its failure to satisfy the time requirements of La.Code Civ.P. art. 2133. This court has previously held that it will not consider an answer to appeal that is filed more than fifteen days after the return date or date of lodging, whichever is later. *Martin v. G. & A Limited, I,* 604 So.2d 1014 (La.App. 3 Cir.), *writs denied,* 607 So.2d 557 (La.1992). For the foregoing reasons, we find that Ms. Smoot's answer to appeal seeking a modification of the general damages awarded by the trial court pursuant to the JNOV is not properly before this court and will not be considered.

*Id.* at 361-62. (Footnote omitted.)

We find no meaningful distinction between the instant matter and *Smoot*, we conclude that plaintiffs' answer to appeal was not timely filed, and we will not consider their request for modification of the trial court's judgment.

**Law**

We will address defendants' first five assignments of error together because they are interrelated. As previously mentioned, plaintiffs moved for a directed verdict under La.Code Civ.P. art. 1810 at the close of the defendants' case. The trial court granted the motion in part, finding that reasonable minds could not reach any conclusion other than that Myers committed an intentional battery on Kelly within the course and scope of their employment with Boise.

5

A directed verdict is appropriately granted in the event that the "facts and inferences are so overwhelming in favor of the moving party that the court finds that reasonable men could not arrive at a contrary verdict." *Guste v. Nicholls Coll. Found.*, 564 So.2d 682, 689 (La.1990). On review, "an appellate court also considers whether the evidence submitted indicates that reasonable triers of fact would be unable to reach a different verdict." *McNabb v. Louisiana Medical Mutual Insurance*, 03-0565 (La.App. 3 Cir. 11/5/03), 858 So.2d 808, 816-17. "However, if there is substantial evidence opposed to the motion, that is, evidence of such a quality and weight that reasonable and fair-minded men exercising impartial judgment might reach different conclusions, the motion should be denied, and the case should be submitted to the jury." *Belle Pass Terminal, Inc. v. Jolin, Inc.*, 92-1544/1545 (La.App. 1 Cir. 3/11/94), 634 So.2d 466, 478, *writ denied*, 94-0906 (La.6/17/94), 638 So.2d 1094. On review, an appellate court considers the evidence under the substantive law applicable to the nonmoving party's claim.

*Gibson v. Digiglia*, 07-1028, p. 3 (La.App. 3 Cir. 3/5/08), 980 So.2d 739, 742.

The substantive law applicable to plaintiffs' claims involves the interplay of three areas of law: tort, vicarious liability, and workers' compensation. In *Caudle v. Betts*, 512 So.2d 389, 390-91 (La.1987) (citations omitted) (footnote omitted), the supreme court explained:

> The Louisiana Worker's Compensation Act provides for compensation if an employee receives personal injury by accident arising out of and in the course of his employment. La.R.S. 23:1031. As a general rule, the rights and remedies granted to an employee therein are exclusive of all rights and remedies against his employer, any officer or principal of the employer, or any co-employee. La.R.S. 23:1032. However, an exception to this rule provides that nothing therein shall affect the liability of an employer, principal, officer, or co-employee resulting from an "intentional act". *Id.*

> In interpreting the statute, this court has held that compensation shall be an employee's exclusive remedy against his employer for an unintentional injury covered by the act, but that nothing shall prevent an employee from recovering from his employer under general law for an intentional tort. *Bazley v. Tortorich,* 397 So.2d 475 (La.1981). We concluded that in drawing a line between intentional and unintentional acts the legislative aim was to make use of the well established division between intentional torts and negligence. *Id.* at 480.

> In *Bazley* this court briefly explained the basic difference between an intentional tort and a negligent act but did not profess to set forth a complete exposition of either branch of tort law. Intentional tort law encompasses far more than could be explicated reasonably in a single opinion. Consequently, when an employee

6

seeks to recover from his employer for an intentional tort, a court must apply the legal precepts of general tort law related to the particular intentional tort alleged in order to determine whether he has proved his cause of action and damages recoverable thereunder.

. . . .

A harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact, is a battery. The intention need not be malicious nor need it be an intention to inflict actual damage. It is sufficient if the actor intends to inflict either a harmful or offensive contact without the other's consent.

In *Reeves v. Structural Preservation Systems*, 97-1465 (La.App. 3 Cir. 6/3/98), 716 So.2d 58, *reversed on other grounds*, 98-1795 (La. 3/12/99), 731 So.2d 208, this court further interpreted *Bazley*, noting:

An injury is intentional, i.e., the product of an intentional act, only when the person who acts either consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or knows that result is substantially certain to follow from his conduct, whatever his desire may be as to the result.

In *Baumeister v. Plunkett*, 95-2270, pp. 3-4 (La. 5/21/96), 673 So.2d 994, 996-97, the supreme court stated:

[T]his Court has held that in order for an employer to be vicariously liable for the tortious acts of its employee the "tortious conduct of the [employee must be] so closely connected in time, place, and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct instituted by purely personal considerations entirely extraneous to the employer's interest." *Barto v. Franchise Enterprises, Inc.*, 588 So.2d 1353, 1356 (La.App. 2d Cir.1991), *writ denied*, 591 So.2d 708 (1992) (quoting *LeBrane v. Lewis*, 292 So.2d 216, 217, 218 (La.1974)).

. . . .

. . . [O]ur *LeBrane v. Lewis* decision considered the following factors in holding an employer liable for a supervisor's actions in stabbing his fellow employee:

(1) whether the tortious act was primarily employment rooted;

(2) whether the violence was reasonably incidental to the performance of the employee's duties;

(3) whether the act occurred on the employer's premises; and

7

> (4) whether it occurred during the hours of employment.
>
> 292 So.2d at 218. This does not mean that all four of these factors must be met before liability may be found.

## The Incident

Both Kelly and Myers held the position of Production Tech V (PTV) forklift operator at Boise. Their chief responsibilities were transporting wood in the facility throughout its processing and completing paperwork concerning Boise's inventory. The forklifts contained CB radios which the operators used to communicate with each other when in their forklifts. Walkie-talkie's were available for speaking to other Boise employees within the plant. The incident in question occurred on the morning of August 28, 2007, in Boise's shipping office, where Kelly had gone after being notified that his forklift was malfunctioning. He was at a desk checking inventory on a computer screen, leaning back in a rolling chair with his feet propped up about six inches above the floor on one of the desk's bottom left drawers. Two other PTVs, Tommy McCarty and Clay Barron, were also in the shipping office, and McCarty had called Myers and asked him to bring a cut sheet[6] to the office.

Kelly testified that when Myers arrived at the office, he told Kelly to call Danny, another employee, to come help to complete the cut sheet. When Kelly refused, Myers' expression changed and Kelly sensed that the situation was about to "get hairy." Myers then asked Kelly if he was telling him "no," to which Kelly replied in the affirmative. At that point, Myers began to approach Kelly, which caused Kelly to take his foot off the desk drawer and sit up on the front of his chair. Kelly then told Myers, "Dwayne, don't. Don't mess with me, Dwayne," but Myers continued toward him. According to Kelly, Myers grabbed his right arm and

---

[6] According to Myers' testimony, a "cut sheet" was a list of how much and what size(s) of wood were needed in the different areas of the plant.

reached up under his calf, picked him up out of the chair, and threw him to the concrete floor. Afterwards, Myers just stood there looking at him on the floor before leaving the office. Kelly remained on the floor for a few minutes because of the severe pain he was experiencing. Barron later helped him up into a chair, and he waited for his supervisor, Shad Roberts, to arrive so that he could report the accident to him.

Myers told a different story. He testified that he asked Kelly to call another employee because there was a CB radio close to him. When Kelly refused to offer him any help, Myers reached across Kelly to retrieve the CB radio from the desk in front of Kelly and, as he did so, he may have lightly brushed against Kelly. Kelly then "went all the way back" and Myers grabbed his legs "to prevent the chair from collapsing all the way over." Kelly ended up on the ground, and, according to Myers, they all "kind-of laughed." Myers asked Kelly if he was okay, and when Kelly did not answer, Myers realized that it was serious and he left the office because he was "behind and . . . in a big rush." Myers testified that it was common knowledge in the shipping department that Kelly suffered from back problems; however, he denied knowing that Kelly had two prior back surgeries.

After the incident, an investigation was conducted by Barry Robinson, the superintendent of Boise's shipping office. Roberts, the supervisor of the shipping department, was present during most of that investigation. According to Robinson, the communications between Myers and Kelly on the morning of the incident were work related and involved Boise business. In his opinion, the incident went beyond horseplay. Robinson testified that he questioned Kelly, Myers, McCarty, and Barron about the incident. McCarty and Barron confirmed that as Myers approached Kelly, Kelly told Myers not to touch or "mess with" him, which, in Robinson's opinion, added credence to the version of events that Kelly relayed to

9

him. The email report that Robinson created regarding the incident, dated August 30, 2007, was submitted at trial as Joint Exhibit 2. In the report, Robinson noted that Kelly told him that Myers had reached down and lifted up his leg off the floor while reaching for his chest, which caused him to lean back in the chair until it flipped with Kelly in it. Kelly told Robinson that Myers was joking around, as he often did. According to the report, Myers demonstrated on Robinson how the accident had occurred, grabbing his leg and pushing on his chest. Myers explained that as the chair began to fall over backwards, he attempted to slow it down and keep it from hitting the floor hard. After his investigation, Robinson determined that Myers' actions were in violation of Boise's policy regarding unauthorized touching. Robinson drafted a Last Chance Agreement (LCA) which Myers signed on September 4, 2007. The LCA noted that Myers had been suspended during Boise's investigation of the matter because of his having been counseled by management in the past about similar issues. According to the LCA, Myers' "poor judgment was a safety violation and . . . caused an injury to a fellow employee," and Myers admitted that "the performance incidents did occur." The LCA provided that in lieu of being terminated, Myers was being given one last chance to continue his employment with Boise.

Within a day or so of the accident, Roberts completed a Supervisor's Incident Investigation report, which was submitted at trial as Joint Exhibit 1. The report summarized the incident as follows: "Ken was sitting in office chair at desk when another employee grabbed him by the leg & shoulder – chair turned over backwards. . . ." The report stated that "horseplay on the part of one employee" was the root cause of the incident. An attachment to the report signed by Robinson stated that he and Roberts had inspected the rolling desk chair from the incident. The chair was several years old and reclined when no one was sitting it. Robinson

had reclined in the chair to test its stability and "never felt the chair get unstable." The attachment noted that the subject chair was replaced on September 14, 2007.

In granting plaintiffs' motion for directed verdict, the trial court noted that the jurisprudence indicated that directed verdicts should only be issued sparingly and that the standard for granting a directed verdict was very high. Nevertheless, after listening to all of the evidence, the trial court determined that "even under Mr. Myer's description of what happened, there was an intentional touching" to which Kelly was objecting and which amounted to a battery regardless of whether Myers intended to injure Kelly. The trial court explained that it was Myers' intent to put his hands on Kelly, despite Kelly's telling him not to, that put Myers' actions "out of the realm of any type of negligence." With regard to course and scope, the trial court concluded that there was no question but that the incident occurred in the workplace, during working hours, and that the precipitating event that caused the incident, i.e., Myers' attempt to get help with completing the cut sheet, was clearly employment rooted.

When Myers approached him in the shipping office, Kelly was reclining in a rolling chair with his feet elevated. It was common knowledge in the shipping department that Kelly suffered from back problems. Thus, as explained by the trial court, it is irrelevant whether Myers touched Kelly softly or roughly, because the evidence overwhelming indicated that Myers touched Kelly in an offensive or harmful manner after being told not to, and, that as a result of that unauthorized touching, Kelly fell over in the chair reinjuring his back. Myers consciously desired to place his hands on Kelly against his will when he came at Kelly despite his protestation that he not be touched. The fact that Myers may not have intended to injure Kelly is of no moment in light of the fact that he intended to inflict a battery, however slight, upon Kelly, whom he knew had back problems and under

11

circumstances that made it likely that Kelly could fall and be injured. Myers' actions against Kelly are no less of an intentional tort simply because the two men were co-workers. We conclude that no reasonable trier of fact could decide that Myers did not commit an intentional tort against Kelly.

The evidence also overwhelmingly indicates that the incident arose as a result of Myers' attempt to get the cut sheet completed and that the incident was "reasonably incidental to the performance of [Myers'] duties." *Baumeister*, 673 So.2d at 1000. On the other hand, absolutely no evidence was offered that points to the conclusion that Myers' actions were motivated by any "purely personal considerations entirely extraneous to [Boise's] interest." *Id.* at 997. By all accounts, before this incident occurred Myers and Kelly considered each other a friend, and there was not a hint of animosity between the two of them.

The defendants contend that they should not be liable to Kelly in tort because the battery did not benefit Boise's business and because Myers' actions violated Boise's policy against unauthorized or offensive touching. We disagree. In *Benoit v. Capital Manufacturing Co.*, 617 So.2d 477 (La.1993), an employee of the defendant was injured when he got into a fight with a co-employee at work over whether the rear door to their work area should be opened or closed. In finding the employer liable to the injured employee for the battery to the plaintiff by his fellow employee, the supreme court noted that while the battery upon plaintiff did not benefit the defendant employer, neither did the supervisor's knifing of the fired employee in *LeBrane*, 292 So.2d 216, benefit the employer in that case. Nonetheless, the employer in *Benoit* was held to have respondeat superior liability for the tortious acts of its employee because the employee's actions were "clearly 'employment-rooted.'" *Benoit*, 617 So.2d at 479.

In addition, this court recently noted that:

12

> Because the policy manual warns against acts of violence and harassment in the workplace, under the reasoning in *Brumfield* [*v. Coastal Cargo Co., Inc.*, 99-2756 (La.App. 4 Cir. 6/28/00), 768 So.2d 634, *writ denied*, 00-2293 (La.10.27.00), 772 So.2d 658], the possibility of violence and harassment at work is a risk of harm fairly attributable to [the employer's] business."

*Edmond v. Pathfinder Energy Servs., Inc.*, 11-151, pp. 9-10 (La.App. 3 Cir. 9/21/11), 73 So.3d 424, 429-30, *writ denied*, 11-2234 (La. 12/16/11), 76 So.2d 1204. Here too, the fact that Boise corporate policy prohibited harassment and other unauthorized touching leads us to the inference that the possibility that its employees will engage in on-the-job horseplay "is a risk of harm fairly attributably to [Boise's] business." *Id.* We conclude that no reasonable trier of fact could find that Myers' actions did not occur in the course and scope of his employment with Boise.

We further conclude that the trial court properly applied the *LeBrane* test in determining whether Boise should be held liable for Myers' tortious actions. *See LeBrane v. Lewis*, 292 So.2d 216 (La.1974). Moreover, we find that the trial court did not apply undue weight to the first *LeBrane* factor because here, all of the *LeBrane* factors pointed in favor of holding Boise vicariously liable for Myers' actions against Kelly because the battery was "primarily employment-rooted" and "reasonably incidental to the performance of [Myers'] duties," and because the battery "occurred on the employment premises and during the hours of employment." *Id.* at 218.

After considering the testimony and evidence in light of the substantive law applicable to this matter, we are convinced that no reasonable trier of fact could arrive at a verdict other than one finding that Myers committed an intentional act upon Kelly within the course and scope of their employment with Boise. Thus, the trial court did not err in directing a verdict in favor of plaintiffs. Conversely, the

trial court did not err in failing to direct a verdict in Boise's favor as the evidence simply did not support Boise's claims that Myers did not act intentionally or that it should not be held vicariously liable for his actions. For the foregoing reasons, defendants' first five assignments of error lack merit.

**Offset**

The defendants contend that the trial court erred in failing to grant them an offset against the tort award for any future workers' compensation payments that it will pay to Kelly, thus guaranteeing that he will receive a double recovery. They claim that their position is mandated by the binding Louisiana Supreme Court authority espoused in *Gagnard v. Baldridge*, 612 So.2d 732 (La.1993).

Plaintiffs point out that they have only filed suit against the defendants for tort damages. They have not sued Boise for workers' compensation benefits and no judgment has been entered ordering Boise to pay future disability benefits or medical expenses. As a result, plaintiffs contend that there is no workers' compensation judgment which can be offset or credited against the tort award made in this case. Finally, plaintiffs submit that "this court has already considered and rejected an argument similar to that" which Boise raises here in *Reeves*, 716 So.2d 58, 62[7] where we stated:

> [T]he situation in *Gagnard* is different from that presented here. In *Gagnard*, the court was faced with the possibility of double recovery because the employer was also a tortfeasor and its general liability insurer failed to appeal. Struggling with this special circumstance and desiring not to afford the claimant double recovery, the supreme court granted the employer a credit for future compensation benefits against satisfaction of the liability judgment. Here, however, La.R.S. 23:1103 prevents double recovery against an employer whose obligation to pay the claimant is mandated solely by workers' compensation law, as opposed to an obligation to pay that is grounded additionally in general tort law. La.R.S. 23:1103 allows the compensation carrier a credit for future compensation computed at 6% per annum, up to the

---

[7] As previously mentioned, *Reeves* was reversed on grounds unrelated to the issues presented in the instant case.

amount of the tort judgment; and, it is not liable for payment until that judgment is used up. Therefore, since the employer is entitled to a credit for future payments by operation of law, no judgment providing so is necessary.

Here, in rejecting the defendants' claim that they were due an offset, the trial court observed, "[y]ou can't satisfy a fixed obligation, or a liquidated amount, with a promise of an expectation of a performance in the future, that's not how a set-off works." In so finding, the trial court noted that to allow the defendants to satisfy the tort judgment "over the next 20 years" when plaintiffs were awarded a money judgment that was immediately due and payable would "totally negate[] the time value money aspect" of that judgment. The trial court also anticipated that problems could occur if defendants were awarded an offset and Kelly were to die before receiving the full value of the tort judgment awarded by the jury in this case.

Based on our prior holding in *Reeves*, 716 So.2d 58, we are of the opinion that the trial court did not err in refusing to grant the defendants an offset against the tort award for any future workers' compensation payments that it will pay to Kelly in the future. As noted by the trial court, the defendants can institute a proceeding in the workers' compensation arena to prevent plaintiffs from receiving any double recovery. The defendants' sixth assignment of error lacks merit.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed in its entirety. Costs of this appeal are assessed to the defendants.

**AFFIRMED.**